And please, starting with the appellant, state your name and how much time you need. Kristen Muller from the State Appellate Defender's Office. If we could do 12 on opening and three for rebuttal. Good morning, Your Honors. Peter Fisher, an Assistant State's Attorney, on behalf of the people. 12 minutes, please. Thank you. Good morning. There are several issues before the court this morning because Martin Roman's trial was riddled with prejudicial errors from start to finish. In the beginning, during voir dire, the trial judge publicly berated the first naturalized citizen on the panel who expressed an inability to judge people. This is significant because three potential jurors prior to this gentleman also expressed an inability to be fair, to be prejudiced or biased. And the trial court simply accepted those answers and moved on. But when it came to this first naturalized citizen from Mexico, the trial judge publicly berated him, shamed him, and notably pointed out to him, unlike all the other potential jurors, that he was an American citizen and asked him, will you do it? He never pointed this out with the others, and he also publicly berated him by telling him he was weak and shameful. This is also significant because after this potential juror, there were five other naturalized citizens on the panel.  This unlikely had a chilling effect on the voir dire process, which notably the State recognizes in its brief on page 22, the trial judge did not have any further problems after this discourse with Mr. Rios. But doesn't that often happen in voir dire selection where the trial judge has the jury box full of potential jurors, somebody starts by saying, I'm not sure I could be fair for one reason or another. And as it goes down the line, each member of the veneer then figures, hmm, if I say I'm not sure I can be fair, maybe I can get out of this. And there comes a tipping point where I think fairly frequently trial judges say, enough of this. We're not going to send the message to everybody here that I can get out of it by saying I don't think I can be fair because it's your duty as an American citizen, as every American citizen has the duty, to serve on juries. I mean, is this any different? Yes, Your Honor. I think it is different from those cases that were discussed in the briefs as well because this case involved singling someone out and discriminating them on a certain factor, his citizenship, being an immigrant, a naturalized citizen. None of the other cases involved that. And it was significant because this was a theme that ran through this trial. When you use the word discriminating, how did it discriminate against this particular juror? He, in the way he treated him by publicly shaming him and berating him, but also why point out that he's an American citizen? Everyone is in the panel. But why with just this one individual? Why not with the homeless worker who said it would be hard for him to sign a guilty verdict? Why did he say to him, you're honest, I believe you, that's all right? And then come Mr. Rios, who's been here since 1979, and immediately he just lights into him. He didn't do this with the police officer, the wife of the police officer, but all of a sudden with Mr. Rios. And, again, none of the other naturalized citizens expressed any bias, and two of them ended up on his panel. So I do think, to answer your question, it's significant here that there was a discrimination. It wasn't just trying to put a kibosh on people trying to get out of jury service, like in some of the federal cases that were in the briefs. In addition to this error, though. On this error, was there – there wasn't any punishment leveled out. There was no threats made. Doesn't that – at least when you look at the federal cases that were discussed in the brief, isn't that a different situation? There weren't any direct – you're right. There weren't any threats to serve for three months on a jury duty. But this case, again, involved something different with the discrimination based on the immigrant status, based on the fact that two immigrants ended up on the jury panel, and that immigration was a theme that kept coming up in this trial. I think that it's different. It's definitely a little bit of a first impression because there aren't any cases directly on point dealing with this. Those cases dealt with – especially the federal cases where you can get juror affidavits to go into this or where jurors contacted the defense attorneys afterwards, and that's not an option in Illinois. So if we can't explore this issue this way, there's just – there's no way to ever explore it. And also, it had the chilling effect on – on Voiadier. And it seemed that if this is to stand, the trial court puts a priority on enforcing the civic duty to do jury service, puts a priority on that over finding a fair and impartial jury, which can't be the case because that's obviously a basic fundamental right. In addition, the trial judge's Voiadier was also extremely flawed when he accepted every potential juror as qualified, regardless of the answers they gave to one of the Rule 431B principles, whether they can hold Martin's decision not to testify against him. Because he didn't testify, this is also very significant. The trial court asked every potential juror some version of a question, you will not hold it against them if they choose not to testify or choose not to testify correct or right. For example, of just some of the different answers that he accepted, jurors 6 and 8 answered the question, you will not hold it against them if they don't testify correct with correct. But jurors 9 and 10 answered the very same question with no. Both can't be right. Similarly, jurors 1 and 12 were asked, you will not hold it against anybody if they choose not to testify, and they both answered no. But an affirmative response to the same exact question was accepted for both alternates. They answered right and yes. Again, both can't be right. This makes it inevitable, just by deduction, that there were jurors on Martin's panel that held it against him when he didn't testify, in direct violation of his constitutional right not to do so. Does it make a difference if it was the alternates with regard to the yes or no, where you have a direct conflict on the same question? It might if there weren't conflicts between the jurors, but because there's also conflicts between jurors 6, 8, 9, and 10, I threw that in just to be more illustrative of the flagrancy of this error. Also, the law recognizes that jurors really struggle with this concept of the right not to testify, and most see it as shelter for wrongdoers. So I believe that it just really prejudiced Martin even more so when he elected not to testify. Also, during trial, a couple errors occurred. His defense attorney allowed a letter to go back during deliberations that basically told the jury, two other juries, juvenile judge, and at a bench trial, all of the co-defendants were convicted. This is inadmissible evidence. It can't be effective representation for a defense attorney to allow such prejudicial and inadmissible evidence to go back to the jury during deliberations. He simply could have redacted this information from the letter, not had the letter go back at all, because that information came out during testimony, so it wasn't necessary. Additionally, a plethora of prejudicial gang evidence was admitted. It was not necessary to prove any of the identifications. The identifications were based on knowledge of knowing Martin and his family members living in the same community four or five years. None of the witnesses based their identifications on this. Even the offense itself, there was no testimony that gang signs were made, slogans were yelled, the tattoos were showing during the offense, none of this. And the law requires that the gang membership testimony be related somehow to the crime charged. That can't be shown in this case, and it just went too far. There was so much gang evidence. It was prejudicial. There was naked pictures of Martin from the waist up, and there was simply no need for this. Even the prosecutor's closing argument argued that the identity was proven without reference to the gang. So the judge did make a limiting instruction to the jury. Your Honor, I don't believe that he did. I did see that in the State's brief. I didn't see a cite, and I can't find any more in the record. Definitely not before Juliana's testimony about gangs. Definitely not during Fernando Garcia's testimony about gangs. Not in the written instructions given to the jury. There's no limiting instruction. So that definitely also differentiates it and makes the effect of the prejudice more pervasive. Lastly, there was several errors that occurred during the prosecutor's closing argument. She improperly diverted the jury's focus from facts based on the determining guilt or innocence and focused on the decedent's fiancé and his friends. This is well recognized as improper. Thinly veiled, emotion-laden appeals to prejudice. The prosecutor also told the jury that he didn't think a camera existed with the necessary flash capabilities to take pictures of the scene at night, which was in response to the defense attorney's challenge of their photographic evidence because this occurred at night and all of their pictures were taken during the day. The problem with that is there was no evidence on the camera capabilities. It's improper for prosecutors to inflect their personal opinions into closing argument and to argue based on facts, not in evidence. The prosecutor also shifted the burden in rebuttal by suggesting that Martin should have presented evidence of who the real killer was. And the prosecutor followed up each instance of the misconduct by kind of telling the jury that they hadn't done what they just said they did, which made it very confusing and misrepresenting the law to a jury. Based on all of these errors as a whole, the cumulative effect of them, we ask that you reverse her amendment for a new trial. Thank you. Thank you. Good morning, Your Honors. And may it please the Court. The thing we must remember about the first issue, which is the voir dire issue, is that the entire issue is waived. There was no objection at trial or in the post-trial motion to anything the judge did during voir dire. And it's important to remember that the judge was there. We weren't. The judge can assess the credibility, the sincerity of the jurors. That's why we have judges conduct voir dire, so that they can look at what the jurors are saying and make a determination as to whether these people can be fair. What about if you have a question and to the same question somebody says yes and somebody says no, and yet the answer as far as the judge is concerned is the same? How do you explain that one? Well, certainly we've all run across instances where there is a question that's posed with a double negative. And double negatives can be answered yes or no or correct. And usually if that were done with a witness, somebody would straighten it out. But if you ask a question that's got a double negative in it, the judge can look, and if the juror is nodding he understands or they understand, it's pretty obvious to the average person that the juror understands what's going on. If we really believe that these jurors were saying, yeah, I'll hold it against the defendant, and the defense attorney just sits there and the judge just sits there, is that really a believable scenario? Of course it's not. That's ridiculous. The common sense application in this case would say that the judge was there. The judge heard the answers. He knew that yes meant yes and no meant no. But the way those questions are posed in the double negative, actually both are correct. It just depends on how the juror is expressing it. If they're nodding and indicating that they understand what's going on. This is a situation where you can't presume prejudice. You can't presume that a juror, a biased juror sat on this jury. Plain error has to be looked at here. This is not a closely balanced case. There are no structural errors in this area. So that what the judge did, and we have to give deference to what the judge did and saw, and we also have to look, you know, would defense attorneys just have sat there? And they still had challenges. At the end of the day, they still had two or three challenges left that they could have challenged peremptorily. So they could have made a motion for cause if they honestly believed that these jurors were being biased, or they could have made a motion, a peremptory challenge, and they didn't do either of those things. And I think when you look at the record as a whole, it's clear that the judge knew what was going on, and this is just a common sense application. In terms of the one juror who he called out, there had been three jurors previous. John Berg, who said he didn't think he could be fair, and the judge said that's okay. And it's clear when John Berg is testifying at JJ44 in the record, that what the judge is doing is he's evaluating the sincerity. The next person who comes up is Edward Sherma. He was director of the Chicago Coalition for the Homeless. He said it would be hard to sign a guilty verdict. And the judge said, you're honest, I believe you. And then the next man, Patricia Dwyer, her husband was a Chicago police officer, and she said it would be hard to be fair. And the judge said, I believe you, too. The next man who stood up gave this I don't want to point fingers at anybody, and the judge, using his discretion, and again, the judge was there, we weren't, said you're making this up, this is nonsense, you can't do this. And it is to prevent the run to the exits that we've all seen in a jury selection situation where one juror says some magic words, gets kicked off, and the next six people say the same thing. You have to guard against that. The judge has to be able to use his discretion to determine whether or not this juror is sincere, is telling the truth. That's what the judge is there to do, is to evaluate the answers of the jurors. Their tone of voice, their facial expressions, their demeanors, he can tell whether or not, based on his experience, these jurors are being sincere about their answers. And he called this person out and said, you know, I don't believe you, this is a hokey answer, and so on. Interestingly enough, the answer that he gave, I don't want to point fingers, I don't want to judge somebody, were answers that would be given by a person who was biased against the state, not a person who was biased against the defense. So it actually doesn't even cut the way the defendant would suggest. The bottom line is the judge was there, the judge saw what these potential jurors were saying, and the judge believed that this person was being insincere and intended to get off jury service. Tell us how evidence of gang membership or any relationship to the charges or the evidence in this case. Well, evidence is always admissible, gang evidence, to the issue of identification. Nobody identified Mr. Roman based on his membership in a gang. Well, Fernando Garcia did say that I see these guys out there all the time. I know they're the guys, and these are the guys that are together as a group flashing gang signs and yelling at people as they go past. So that's the reason he knows them. He doesn't know them from, that's the main reason, because there's a group. He knows them from seeing them on the corner. But they're doing something on the corner. They know them because they stand out there. What they're yelling is irrelevant. He sees them all the time. As the other eyewitnesses say, I've seen all these people all the time. And even Juliana Flores also said, I've seen them. I know they're gang members. They hang out together. You know, it's significant that on the December 4th incident and the December 23rd incident, we have the same people hanging around together, the same people hanging in the parking lot. These are the people that are always out there. These are the people that are yelling gang slogans. So it is relevant to the identification issue. Where is the evidence in the record about somebody yelling gang slogans? Well, Fernando Garcia suggests not during the crime itself. Well, that's what I'm talking about. Previously. Well, previously. But that's how he knows him. That's how he knows him. I thought he knew him because he'd seen him before and seen him in the neighborhood for many years. Doing what in the neighborhood, though? It didn't, whether, the idea, my understanding of the case is, say, very limited. And the identification can be made without any reference to the gang affiliation. And, in fact, you said there was no question that he could identify these people, right? There's no question. You admit that in your brief. So why do you have to bring in something in addition after the fact? There is no question about the identification. No, and that's because he explained why he knew them. And also, gang evidence is admissible to explain an otherwise inexplicable act. And if you put the two acts together here, we've got the December 4th act and then the December 23rd act, and this group of people acting together, the inference is that there was a gang-related motive for the crime. Leave the gang membership entirely out of it. The evidence is that on December 4th, these people, some of these people, saw members of this group try and get into the factory. They weren't let in, and they smashed in all the windows. Several weeks later, same group, a worker at the factory comes out. They drag him off the forklift and beat him. What relevance is gang membership to that evidence? It's relevant to show why a group of people acted together in two different violent incidents, which would otherwise be inexplicable. Why is it inexplicable? Why is it inexplicable for gang membership? I don't understand that. Often in these cases, the question is why would this group of people act together? Sometimes they're friends. Sometimes they're gang members. Sometimes they're family members. But the relationship between the parties, between the individuals, is relevant to determine what, you know, to show what happened at the time. Then that would seem to me that in any criminal prosecution involving more than one defendant, evidence of gang membership comes in because it shows why they were together. It might. And that's not the law. Well, actually, I think it is a relevant factor. If you can show that they have some relationship, and, again, looking at it from the jury's perspective, you know, why would these people do this together? Why would they commit a crime together? They have some relationship. And it was important to show the relationship between these individuals, that they were the same individuals that did the December 4th crime and the December 23rd crime. But what evidence in the record can you point to that these two were related incidents? The fact that they happened at the same place? No, no. You argued that they happened at the same place? That means they're related. Well, there is an incident in the factory where the one individual comes out bloody, comes into the factory all bloody, and the worker in the factory goes outside and his car windows are smashed on the street. Sylvia Ortiz sees that, sees that this group of people was involved in that incident. Basically, they were trying to get into that factory. They couldn't get into the factory. And then they, because they couldn't get in. Was there any evidence that gang signs were made? No. Was there any evidence that gang slogans were made? Not at that time, no. Or at any time? No, and that wasn't the people's theory. The people's theory was to show the identification and how this person knew how. But they knew him from looking in the neighborhood. I mean, it was clear that they knew him from the neighborhood. Gang affiliation. Well, you know, the cases are clear. You can't sanitize it. Just, you know. You already had a clear identification. That's the question. There was no question when they testified that they knew who these people were. They identified them without having seen anything related to the gang. Well, there was a gap. They didn't identify them the first day. One of the reasons they said they were afraid of them. And, yes, we argue that even absent the gang evidence, that the identification was good. But if there is a relevance to it, and the judge, again, he had a hearing. He weighed the prejudice versus the probative value. And he decided that he would let the gang evidence in. Did anybody testify or suggest that they couldn't identify the defendant without seeing his gang tattoos? No. So of what possible relevance is a photograph of the defendant without a shirt on showing his gang tattoos? The relevance was to show that two of these people, Juliana and Fernando, had identified this defendant and the other defendants as members of the Latin Kings. And this was to corroborate that, in fact, the defendant was a member of the Latin Kings. That was the relevance. But what limit was there? Counsel for the defense said there was no limiting instructions. Where in the record are there limiting instructions? I don't believe there was. I didn't. So there are none. The judge did wardeer the jury prior to the, you know, during wardeer about, would you hold it against someone if they were in a gang? Yes. But after that, there's nothing in the record of any limiting instructions regarding this testimony. No. Thank you. The other issue that counsel mentioned was the letter that supposedly went back to the jury. There's no evidence in the record that that letter actually went to the jury. The letter itself was never read to the jury. What happened was on cross-examination of Fernando Garcia, the defense asked, did the state write a letter to INS explaining that you had given help? And he said yes. The letter was not introduced at that point. Then on redirect, a letter is discussed. The state shows Fernando a piece of paper that's talked about as Exhibit 1, but the judge says the document's English. Withdraw the document. Later on, there's a discussion that this exhibit, Exhibit Number 90, which is never identified anywhere else, was in evidence. However, at the end, after closing arguments, the court says, I'll ask the lawyers to go through the exhibits with each other, whatever you agree on to give to the deputy. If there's any dispute, let me know what it is and I'll help you solve it. We don't know exactly what evidence did go back to the jury based on that record, and it was incumbent on the defense to make a complete record. Even if it is, the evidence in this case was not closely balanced. The evidence was, in fact, overwhelming. On one side, you had three eyewitnesses that placed defendant there, so that even if this had gone back and there's no evidence that it did go back, it would not have been the straw that broke the camel's back, nor would the gang evidence itself have been the straw that broke the camel's back. The evidence in this case was overwhelming, and we'd ask that you affirm defendant's conviction and sentence. Thank you very much. Ms. Buehler? Just briefly, in response, Your Honor, as to the gang evidence, this was not related to the identifications at all. The witnesses all testified that this group of boys were related to their family lived in the area. They rented an apartment out to the boy's uncle that lived beneath them. They knew the family. It was not needed to show that they acted together. As the State just conceded on oral argument, they can show this by showing that their family acted together. Well, if there was an argument that, or on cross-examination, there was questioning directed to why didn't you go to the police, why did you wait several days before going to the police, certainly the prosecution could bring out the witness's fear of these individuals because of their gang membership. Couldn't they properly? I believe so, Your Honor, but the witnesses were able to testify without bringing up the gang evidence. They said that they were just afraid of them, again, for the same things that I've just said, because they knew their family. They were afraid of their family. Their family lived in the area. The uncle lived beneath them. They were afraid the uncle might hear them. And this was, Sylvia has testified to all of this without bringing up gangs at all. This trial actually showed how to do it without bringing up any gang evidence, based on the testimony and even the prosecutor's closing argument. It simply wasn't necessary, and it was prejudicial, and it just went too far. Also, there is evidence that the letter from the prosecutor to the Immigration and Nationalization Service went to the jury. That would be on page NN73 of the record, and also on page NN76 to 77, the prosecutor did remove some exhibits that he did not want going back to the jury. They were mainly stipulations from other trials. This was not one of them. It did go back to the jury. The jury is presumed to follow the law and the instructions given to it, and that would be to consider all the evidence before it, so there's no reason to assume that this letter was not considered by the jury. Lastly, there is no difference between Miguel Rios' response during voir dire and the homeless worker or the wife's response. Saying that it would be hard to sign a guilty verdict is no different than saying you don't particularly like pointing fingers at anybody. There's no difference here. The difference is only in the way the trial judge treated these people. It's improper, and it has a chilling effect. Discrimination can't be used just to enforce a civic duty, a jury duty service on people. Also, regardless of whether it was forfeited, as the Brown Court recognized in some of the federal cases in the briefs, the forfeiture rules relax, especially when such a basic fundamental right is involved. The trial judge was there to assess the credibility, but he failed to do so. Doesn't a veneer member's tone of voice, their facial expression, their body language, all inform the judge's reaction to their sincerity when they answer a question in a way that may get them out of jury duty? Taken in context, Your Honor, maybe with certain words I would agree with you, but when we're talking about comparing yes and no, these words have to mean something. Yes and no, there's no wiggle room with that. I was referring to Mr. Rios' response that I don't like to point fingers at anybody. I mean, there's a way that that could be said that would lead the trial judge to believe that this is not a sincere belief on this particular veneer member's part. Yes, and I agree, Your Honor, but I think that it went too far at the point when he discriminated against him based on his immigrant status, which has an effect in this case because of the two jurors who were naturalized citizens that end up on the panel. And this is what makes it different than Colabella, which was relied on in the Brown case. It's a federal Second Circuit appeal case. Very similar to these facts, except for where the judge discriminates based on this fact. He didn't call anyone else out and say, you are an American citizen. This is shameful. Will you do it? No, he only did that with Mr. Rios, and that didn't happen in these federal cases. Maybe the judge was annoyed with the waterfall effect of people trying to get out of jury duty service, but none of those judges publicly berated and discriminated, and that's the difference. This can't stand. The right to a fair and partial jury is more important than enforcing civic duty to perform jury service. Thank you very much. Thank you. Thank both counsel. Excellent arguments, and we'll take it under advisement. We'll take a few minute break before we resume.